Ernest and Sondland v. Chumley. Case number 4090663. For the appellant is David Liefers. For the appellee is Michael Fleming. Mr. Liefers, you may proceed. Good morning, Your Honors. This is an interesting case. Bob and Dorothy married in 1989, and they'd both previously been married. They both had at least two children by their previous relationships. And in 2000 they entered, or they created what I would call reciprocal wills, which had interesting language. And that essentially was that Bob left everything to Dorothy if she survived. Dorothy left everything to Bob if he survived. And then the survivor was to divide the estate among Bob's two children and Dorothy's two children. And Article IV of that particular will went on to provide that in essence it is their intent that upon the death of the first of us, in this case Bob, the terms of the will of the surviving spouse shall be irrevocable. That created a contract. And that contract minimally meant that the survivor could not take any action that would disrupt that testamentary scheme. What action would that be? Would that be coming up with a will that was inconsistent? I think that is, yes, that's true. But I think in the facts of this case are interesting and probably distinguish it from almost any other case that I think has been decided by the appellate court or the Supreme Court. Because within two months of Bob's death, Dorothy created a new will which disinherited Bob's children, left everything to her two children. At the same time she created a trust and transferred certain personal property to that trust, the residual beneficiaries of which were her children. At the same time she, or shortly thereafter, she deeded the jointly held real estate, that is the real estate she and Bob had owned together into this trust. My clients file this case through Mr. Ramelkamp's office in October of 2004. Dorothy remarries in December of 2004 and she creates another will. This will leaves everything to Mr. Chumley, if he survives, otherwise it leaves it to her two children. Well what did article two of Robert Satterborn's will say? What does that mean? Well what that means, Your Honor, is that, simply what it says, is that upon... It means that we're wasting our time talking because he left everything to her to survive him, right? I don't respectfully disagree. Every case has been decided. There have been like provisions where one spouse leaves everything to the other spouse. There's been language in fee simple, there's been language absolutely. And even in those particular cases where there's been, the court's determined that there's a contract, there's been some restriction on the surviving spouse's ability to dispose of that property other than what was agreed to. Let me ask this counsel. You've done a good job of summarizing the case. I'm familiar with it. It's a bad case. It's one that gives me a lot of concern for the reasons you mentioned. On the one hand, it's clear that Dorothy is doing bad stuff. By any standard, this is inconsistent with the spirit of what this was all about. On the other hand, we're supposed to be applying the will as written. This was the agreement between the parties. And it seems to me that what you're asking for, and I noticed that the trial court wrestled with this as well. What does this mean? Is this supposed to be a constructive trust where the trial court judge or some third party is going to now be in charge of this money? As Justice McCullough pointed out, Dorothy's got it all. Deciding what she can spend, how she can spend it. I know the trial court's musings about this, which are the same ones I have. What if she wants to travel to Haiti? Would that be okay? But what if she wants to travel to Haiti and bring her new husband? How about that? Or one of the kids of her first marriage? Who is to decide these things? And the other problem is, all of this, it seems to me, is clearly foreseeable. So if Robert and she wanted to, in fact, put some constraints upon the other, they could have, as a lot of the cases demonstrate, set it. You know, like a life estate. We all know what that means. She has this to enjoy during her life with some limitations upon it. But, as Justice McCullough points out, there aren't any limitations. So if Robert and she intended this, why shouldn't we require them to say it? On the other hand, I'm troubled by what's happened here because Dorothy seems to be in the process of rendering this null by essentially, my question for Mr. Fleming, could she simply just get rid of all the property so that when she dies, she's essentially bereft of any property or funds? But by God, she still has the joint will. Right. Meaningless will. Joint and then meaningless will. But, I mean, this is what they've agreed to, isn't it? Well, first of all, the first decision, or the first question the court brought up is essentially forming a remedy. And believe me, when I first read the trial transcript and the musings of Judge Olson at the end of the trial and his questions to Mr. Ramelkamp and Mr. McNeely, I had scratched my head at that point and have since. Because very candidly, I think what this means is that if we convince this court to reverse Judge Olson, I think the best plan is to remand it to Judge Olson. I would then at that point in time pursue my remedy argument because Judge Olson never really even addressed the remedies in terms of this decision. What would you argue to him? Well, my argument to him is that with regard, and we're talking about basically cash money at this point in time. And by the way, this sort of dovetails with what the court asked towards the last. And she has basically put this beyond control. The last disposition of about $200,000 worth of cash was in the joint accounts with her husband, Mr. Chumley. So unless my clients have a remedy at this point upon her death, I mean, virtually they have no remedy whatsoever. But my argument to Judge Olson, my suggestions to Judge Olson would be that in fact he impose a constructive trust on these monies. That doesn't necessarily mean that Dorothy has a duty to ask permission before she expends money for her care, her needs. And of course there are a whole host of arguments with regard to what that means. And that may even require some evidence as to Bob and Dorothy's lifestyle. You know, it's one thing for her now to give $100,000 to the First Presbyterian Church of Jacksonville. If in fact they had had a history of doing something like that. Who would be the trustee in deciding these questions? I'm sorry, sir. Who would be the trustee who would be deciding these questions? Well, I don't know that there would be a third party trustee. I suppose ultimately the court would decide these questions. Oh, that's going to be a wonderful task for Judge Olson. It seems to me that assume that Dorothy had never remarried, Dorothy had never made another will, were still operating under the original reciprocal wills, and Dorothy's got $200,000 through the liquidation of assets and whatnot. She's got cash in the bank. There's no restriction on what she can do with that money in terms of going out to buy a new car, taking a trip, seeing to her daily needs, especially as she grows old. Is that correct? I would agree that there is no express restriction with regard to her use of the money for her daily needs, yes. Well, and desires. I mean, if she wants to come to Springfield and go to Israelhausen and buy a big old Mercedes, she can do that. Right? Right. I mean, she needs a new car, so she gets a really nice one because she's got her former spouse's cash. This sort of reminds me of this Court's comments in the Erickson decision, where Leah Erickson, within five days of the date of her death, and contrary to her contractual agreement with her deceased husband, starts heeding out parcels of land. And essentially, the appellate court, in its decision, basically said there are interesting questions which remain as to whether Leah could have sold some property to make a modest gift to a charity or to travel the world. We need not analyze those possibilities, and we need not decide whether Leah, after Charles' death, could have sold or given this property at a different time under different circumstances. Because the facts were, she had done A, B, C, and D. Just like the facts in this case were that Dorothy created two new wills, a trust, she's transferred property into joint tenancy with her current husband, and so she's definitely breached this agreement. Well, we're in his will that would say anything about a specific agreement. Other than to give her, if she survived 30 days, she gets everything. A specific agreement to... Well, they... I'm sorry. You feel that Fleming is a case in support of your position? Yes, Your Honor. But the facts in that case are entirely different, weren't they? Wasn't it an irrevocable joint and mutual will? Well... Was it or not? Yes, that's true. What was it here? We have his will, and I really, as a member of the panel, don't understand why we are concerned with anything but his will. For he gave everything to her. This is not a joint will. True. It doesn't even mention any other will. And even when you have joint and mutual wills, it's what the parties basically have done. What they've done here is no different than a joint and mutual will, in my estimation. They've provided for it. They've come from different families. They've provided for a testamentary scheme, and the parties went a step... Well, I'm not arguing that we have two mirror-image wills, like Mr. Rammelkamp called these, that didn't have something in it to indicate that there was a contract between these parties, because I think that's specifically covered in Article IV, Your Honor, where it says it'll become irrevocable. Those wills become irrevocable. Well, how do you get by Article II, which gives her everything? Well, I suppose if... It never mentions her will or anything else. I understand. Obviously, these wills were prepared by the same firm, executed the same day, made reciprocal provisions for each other. Both of these wills contain the identical language with regard to the irrevocability of the will. The lower court determined that, in effect, based upon the language of the will and the intent of the parties, that that became a contract. And that became a contract not to revoke wills. And the case law is that, essentially, upon the death of Robert, my client's interest vested. What case best supports your position? Well, I think in terms of... And this goes back to Justice Steigman's question a moment ago, in terms of the remedy or any restriction. I think that there are several cases that I believe support a restriction on her ability to use that property in her life. Which one? I think, for example, the estate of Erickson, this Court's own decision from 2006, where Leah transferred the property, real estate, preceding her death. And those transfers were set aside. There obviously was an implicit restriction on her ability to do that, based upon the contract. I think the Fleming case that Your Honor referred to earlier has some interesting language with regard to the surviving spouse's use of property, including intervivals transfers. The Court in that particular case, which was the 3rd District 1980 case, said, essentially, regardless of the wording of the will, if property is left to third-party beneficiaries who are to take upon the death of a survivor, most courts consider any intervivals transfer made by the survivor with an attempt to avoid the agreement to be improper. What are you reading that from? I'm reading that from the Moline National Bank v. Fleming case. That's the Fleming case? Yes, sir. And that was a joint and mutual will? That's correct. And the true significance of that was that the Court determined, as the lower court did in this case, that, in effect, that was a contract. And then Fleming was asked to decide, okay, so if there is a contract, so what? What does it mean under the facts of this case? And under the facts of that case were the husband, after the wife died, had created joint accounts with third parties, and then he died virtually without any assets because everything was in joint tenancy with these third parties. The Court determined that those transfers were void. All these cases dealt with litigation that occurred after the surviving spouse's death, did they not? I believe that's correct. I can't think of one that didn't. None of them dealt with the situation that we're confronted here, with which we are confronted here, and that you're probably asking Judge Olson to address if you persuade us to reverse, namely the creation of a constructive trust and some third party serving as the arbiter of deciding what the surviving spouse's appropriate use of this property that was willed to her would be. Would we be the first to so hold? I cannot think of any case where this issue was raised while the surviving spouse was still alive. And the problem, again, going back to the very first question I asked, is this. All of this is foreseeable. You know, that people behave in their own self-interests. You know, when people become widows or widowers, the break of the influence of the dead hand is gone, minimal. And we see in other instances, in researching this, I've seen lots of instances where apparently not only was this foreseeable, but people put things in their wills. Life estates or created constructive trust, literally. That would have done it, wouldn't it? I mean, Robert and Dorothy could have created an intervivalist trust, surviving the death of either of them, which would have had the First National Bank of Jacksonville, or whomever, handling all this money and deciding that, or making sure that things were handled appropriately. But Dorothy had a comfortable life, but that she would not be permitted to squander this stuff, or indeed sell it for cash, or do other things inconsistent with the intent. But they didn't do any of it. You want us to amend their documents to cause it to happen? No, I don't want you to amend the document. I simply want the document enforced. Well, but as Justice McCullough points out, here, Dorothy, here's your property after I'm dead. Don't write a will inconsistent with what we agreed to. Even if she wrote a will inconsistent, we could address that later, but of course, it probably wouldn't matter, because the estate is going to be judgment-proof if they have nothing left. Like the Erickson case. Yeah, but no one put any restrictions, and we don't know what Dorothy's will looked like had she died first, and Robert inherited everything. There might not have been any restrictions on him either. And you say, well, it was probably the same firm. You're probably right, but is this a matter of bad lawyering? Is it your suggestion when you tell us that, that the lawyers really didn't carry out what the parties wanted, were talking about, they just didn't dot the I's and cross the T's to achieve it? I would never suggest that to the court, because there was no evidence to that effect. There's nothing, certainly, in the record to that effect. I would suggest, you know, so I am not really in a position to really comment, Your Honor, with regard to the lawyering or whether it's good or bad lawyering. With regard to the issue of foreseeability, that sort of cuts both ways. Like, for example, in the Orso case, they had specific language in that case in the will, something to the effect of, I've got it written down here. It is our desire, intention, et cetera, that the survivor of this take and hold the whole estate of the deceased in fee simple with the unqualified right to trade, sell, mortgage, or otherwise dispose of any and all part of said estate as he or she shall see fit. Well, certainly in that particular case. Well, excuse me, Counselor, your time is up. You'll be given another five minutes to address this in rebuttal. I appreciate it. Thank you, Your Honor. Thank you, Counselor. Mr. Fleming? Are you here to defend Dorothy, Mr. Fleming? Thank you, Your Honors. Dorothy or Judge Olson, perhaps more shortly. May it please the Court, Counsel. Counsel. Mr. Liefers says that he wants the contract enforced and says that minimally, as I understand it, that there are restrictions on Dorothy's ability to use the property subsequent to Robert's death. Those restrictions are not in these wills. They're not part of any express statement made providing such restrictions. And I think what minimally it does is it says that each party is able to or it is required to leave everything evenly to the two sides' children if they're the surviving spouse. Well, let me ask this, Counsel. It looks to me like Dorothy is hell-bent upon essentially dying broke, having given away her money and enjoyed herself and whatever, so that technically, I guess, you know, even if her wills were set aside, challenged after her death, we're talking about a judgment-proof estate. They wouldn't make any difference because there's nothing left. Clearly, that doesn't seem to be what Robert and she intended when they wrote these things, or they wouldn't be concerned about the irrevocable wills if Robert envisioned Dorothy disposing of all of this property. So if we put our judicial imprimatur upon this, aren't we in a sense empowering Dorothy to engage in this bad conduct? What we're trying to do is we're talking about the spirit of the agreement such as it is. We're talking about trying to guess with a little bit of knowledge but still guess at what the party's true intents were. The only evidence of intent beyond the pure language of the parties are a couple of statements made by Dorothy in the trial court, one of which was the fact that the survivor was to be able to use the property for his or her needs, which was not expanded on at all, and specifically twice at that time. Is she putting the cash in a joint tenancy account with her new husband, using the property for her needs? Well, the problem with it, Your Honor, is that there was that statement surrounded by two statements to the effect that if there was anything left, it would go to the kids. There was no expansion on the testimony as to what she meant by needs, etc., and she later indicated that it was her understanding that the children had no rights or control whatsoever over the property during the lifetime of the survivor. I think that's at page 51 of the transcript. At best... But you didn't answer Justice Appleton's question. Well, in terms of needs, it depends. How could it be her needs to put her property in joint tenancy with her husband? It could be any variety of reasons. The joint ownership of properties, the court well knows, is a very common thing for all sorts of reasons. As I read the trial court's decision, the trial court basically agrees with Mr. Liefers that these two wills had the effect of a joint mutual will that your client, despite having made two other wills subsequent, there is going to be bound by the original will. I think Judge Olson found that to be a binding contract. No problem with that. But Judge Olson says, I have no remedy because she has an unfettered right to use her inherited property as well as her own for her own needs, benefits, entertainments, if need be. And up to that point, I'm right on target with Judge Olson. Where I do have a difficulty is the creation of a joint tenancy ownership in the corpus of the joint estate that existed at the time of Mr. Sonneborn's death. That's where I've come into some difficulty. Again, my concern is that the parties could have easily stated, without even getting into any type of flowery language, could have easily made statements in the will that would have said, it's our intent that whatever the survivor has will be used solely for the needs of that person. You could provide such restrictions as you want. At least there would be some statement that that was the intent. We can certainly look at this and say, it seems like that might have been. Or Mr. Sonneborn probably didn't understand that he was married to a serial marrier. And since he passed away first, we don't know if he shared that trade or tenancy. The problem, again, I think, is trying to read this in, trying to guess, according to the language, what was done. And quite frankly, your honors, I think the only way this court can take this situation and reverse Judge Olson is to lay down a blanket rule as a matter of law that if two parties married to each other execute wills with this language, that creates... What language are you talking about? Are you talking about Article 4? I'm talking about a combination of Articles 2, 3, and 4. But 2, if you look at his will in 2, he gives everything to her if she lives 30 days. Right. And it also expressly says at the end, I expressly, if she survives me, I expressly make no provision for any of my children. So that's part of Article 2 as well. Well, let me ask you one other question. I've looked at the briefs, and are any of the cases cited by any of you gentlemen with authority deal with other than a joint mutual will? There are. I think there are a couple of cases that deal with... Which ones? To be honest, Your Honor, I can't tell you off the top of my head, and I apologize for not being able to do that. But those deal with situations after the death of the second of the parties. There are no situations where a court has been asked to place restrictions on the use of the property during the lifetime of the survivor. Let me ask you this question. Maybe this gets kind of to the heart of it. Assuming that Judge Olson and we find that, based on our assessment of this record, Dorothy's behavior is bad. Dorothy is acting inconsistently with the understanding of this contract for joint wills. But that seems to be, at a minimum, what the wills were. There's this old contract law provision that says, parties to a contract are expected to act in good faith with regard to their role in the contract. Assuming we find that Dorothy is in violation of that, is there anything we can do? Or do we just have to sit here and say, boy, this is too bad. It becomes very complicated. The court has already observed the question of who steps in to take charge, who oversees these decisions, and counsel has suggested that the court would be in a position to do that, which would be the type of potentially daily, ongoing review. I think that's likely to be the order of this Court of Judge Olson. But if, you know, who? Well, see, and that's part of the problem that I see. I don't know. And the standards would not be absolutely clear how that would be judged. I would feel more comfortable about at least having to try that if the contract provided by the wills more clearly indicated that that was the intention of the parties, that there were to be restrictions, that property was not to be given away. Well, Dorothy, with commendable candor, when she testifies, says, yeah, that's pretty much what Robert expected, but, you know, the hell with that. And there was a statement by her that was kind of to that effect. But, again, she also testified that the children were not to have, her understanding was the children were not to have any rights for controlling the property. Well, Mr. Fleming, it goes back to my question. If we think Dorothy is acting in bad faith, is there anything we can do? I'm not sure that there is at this point. Does it have to wait until she's dead to sort it out? Yeah. And, I mean, I think that's the obligation that was created. I think if Mr. Sonneborn or, for that matter, if Dorothy had wanted to create greater obligations on the part of the other party should that party survive, they should have said so. Or they should have enacted a different scheme. There was reference to a trust being set up, which certainly could be used to do that. The Wills themselves could have given certain property to the children at the get-go when the first party died. There's a variety of ways that that could have been done if that's what the parties wanted to do. And I suppose if the court wants to suppose that the parties came to draft for the Will to say, we want Wills that will accomplish what Mr. Liefers is suggesting should be accomplished here, and the Wills were prepared in the manner that they were, and they were somehow assured that that was what was going to happen, then it does get into a question of perhaps poor drafting or poor lawyering. As Mr. Liefers says, there's no suggestion of that in the record. And I think it's just a matter of where they didn't think about it that much and probably never got to the point where they analyzed, well, what could happen if this, what could happen if that. Obviously the possibility of remarriage. What happens if, let's say she didn't change her Will, but she remarries, she then dies, and Mr. Chumley has his rights of spousal share and renunciation of the Will, etc., so he can take a big chunk of the estate anyway. Did they then have a claim against him because of that? Was that something that was anticipated? I think what plaintiffs are seeking is to ask the court to guess too many things. But again, I think this court would have to look and say when this language, when you have two Wills and it says I give everything to the other spouse and the survivor will leave everything equally to our two kids, nothing more, just as the language is in here, that that automatically creates a contract that by law places whatever restrictions this court says it places on the disposition of the property. For example, it may be saying that property cannot be given to anyone else for less than fair market value except in compliance with past traditions of the parties in charitable giving or something like that. That's the type of rules that I think this court has to create in order to grant plaintiffs relief here. And I think the first question has to be, the first question is not, was Dorothy acting in bad faith? It's not what remedies can be granted. The first question is, what was the agreement of the parties? Are we even in a position where there's been some sort of a breach and that some sort of equitable relief has to be considered? And I don't think we can get to that point, again, unless this court is willing to go past what is its statement in Erickson and to make a blanket rule, again, as a matter of law. So the court's prepared to do that. Your Honor, you're basically disagreeing with Judge Olson's findings in terms of the contractual relationship that was established by the execution of the wills. I'm not, Your Honor. I agree that there was a contract created, and I believe that the terms of the contract were that the survivor of the parties would leave anything that he or she had left at the time of his or her death equally to the children of both sides. But as we stand here now, as today, your client is in breach, right? She's made a new will. She would be in breach if she died today with her new will in place. I mean, technically, she can go back before she dies. Yeah, anticipatory breach. But I don't know that there's anything that the court can do as a remedy at this point given the fact that that could be corrected, et cetera. And there are cases that have been cited by plaintiffs that deal with attempting to address those matters after the death of the second party. Beyond that, in terms of finding that there is a contract that prohibits her from placing property in joint tenancy with her new husband, which, again, could have been prevented or avoided by the parties had they chosen to do that earlier. In terms of reading that in and saying that that is a breach, which then could trigger some instant relief by the court, I think that's going too far unless the court's prepared to say that that type of restriction is automatically read into wills of this type. I'm not suggesting that it necessarily shouldn't be said, although I think then we're getting to the point of taking discretion away from parties and attorneys. I think we have to kind of allow the people to say what they want and hopefully mean what they say and not read a lot of things into what they have just because we think, well, maybe they wanted to do this or maybe they wanted to do that. Okay. Thank you, counsel. That's all. Thank you, your honors. Is there any further rebuttal, sir? Briefly. Okay. I guess within five minutes you have to be brief by its very nature. Anticipatory breach, I think that's something that really is foreseeable in the facts of this particular case. I think that's probably a very little question. Certainly, the court asked a question a moment ago with regard to foreseeability. Certainly, perhaps if the parties were thinking that they might have, if they wanted the survivor to have unfettered views, like in the Orso case, they might have put in language to the effect you can use it for whatever purpose you want to use it for. And if there isn't anything left, so be it. Or they could have, if they had their thinking caps on, they could have perhaps put language in there that restricted views. The fact remains that they didn't. There was no restrictive language in these particular contracts. However, in the cases that have been decided by the appellate court of Illinois, including this court, and by the way, Justice Appellate, the one case that I think of off the top of my head that does not involve a joint and mutual will, but involves separate documents, is the Fourth District's case of Freese, F-R-E-E-S-E, where even in the Freese case, this court held it was a situation where they had made mutual wills providing for equal division of property between the four children. The wife dies. The husband makes new wills with various provisions, changing his son's interests. He makes cash gifts in advance of death. The suit was for specific performance and an accounting. The trial court granted relief and it was affirmed on appeal. But even in those instances where there are no express restrictions, there have been, for the lack of a better term, implied restrictions. And those restrictions have been enforced by the appellate courts in the Supreme Court in Helms, Erickson, the Fleming case, the Freese case. This court's decision, and I've probably mispronounced the name, Rauch, R-A-U-C-H, 1983. Interesting. What the Fourth District at that time, well, it was sort of an interesting situation. Basically, husband and wife have the joint and mutual wills. Wife dies. Son, a beneficiary under that will, dies. And his wife then brings an action to enforce the will, claiming that she's entitled. And the Fourth District held that the son's interest vested under the joint and mutual wills when mother died, the first parent to die. But the court went on to say, and I quote, a life estate is created in the surviving test taker, and the third party beneficiary is received a gift over. And that third party beneficiary's interest is vested upon the death of the first test taker. Is that case in your brief? Yes, Your Honor. If I may. No, I'm sorry. That case was actually raised by counsel in his brief, and I address that issue in my reply brief. So if there are no further questions. Okay. Thank you, counsel. We'll take this matter under advisable recess for a few minutes.